## FRANCOEUR *v.* NEWHOUSE.

*(Circuit Court, N. D. California.  August 6, 1890.)*

1. PUBLIC LANDS—RAILROAD GRANT—EXCEPTION—MINERAL LAND.
   Where a grant to a railroad company excepts mineral land, the term "mineral land" means land known to be mineral land when the grant took effect or which there was then satisfactory reason to be believe to be such.

2. ADVERSE POSSESSION—GOVERNMENT TITLE.
   Possession held in subordination to the title of the United States may be adverse as to another claimant.

At Law.

This is the same case, the decision in which—on demurrer—is reported in 40 Fed. Rep. 618, where the facts alleged in the complaint are stated. Some three months before the commencement of the suit, for a consideration equal to the government price of agricultural land, the Central Pacific Railroad Company executed a quitclaim deed to plaintiff in which they "do remise, release, and quitclaim to the said G. H. Francoeur, his heirs, and assigns, all the right, title and interest that the said company, or the said trustees now have, or may hereafter acquire from the government of the United States in and to" the premises in question, "reserving however, all claim of the United States to the same as mineral land."

*A. L. Hart* and *Geo. H. Francoeur,* for plaintiff

*J. M. Seawell* and *J. B. Reinstein,* for defendant.

Before SAWYER, Circuit Judge.

SAWYER, J., *(orally charging jury.)*  I announce to you that I have prepared some special issues in addition to the general verdict, upon which I desire you to find.  It may save future litigation.  I will read them to you so that you will be prepared to appreciate what I have to say upon these points.  The first is—"We the jury in the above-entitled case find for the"—plaintiff or defendant, whichever it turns out to be.  You will write in either "plaintiff" or "defendant," according as you find on all the issues in the case.

### SPECIAL ISSUES.

The next one is:  (1) Was the land in question known to be mineral, or was there good reason to believe it was mineral, at the date of filing the map of general location of the route of the road, and the withdrawal of the lands by order of the secretary of the interior, on August 2, 1862?  (2) Was the land in question known to be mineral, or was there good reason to believe that it was mineral, at the time that the line of the road was definitely located in 1866?  (3) Is the land in question, in fact, mineral land?  (4) Had the defendant and his grantors been in the continuous, open and notorious adverse possession of the premises in question, claiming to be in the rightful possession under the laws, and afterwards under a patent of the United States adverse to

the claim of the plaintiff and his grantor, for a period of five years next before the commencement of this suit, on June 28, 1889?

Gentlemen, I will now proceed to state to you the law which governs this case, which is the province of the court to determine. You will take, and apply it as given to you by the court, whether it meets with your approbation or not. It will then be your province to find the disputed facts in the case, and those issues you are to find, upon the testimony before you, either for the plaintiff or for the defendant, as the preponderance of proof in your judgment requires. It only requires a preponderance of proof. You are the exclusive judges of the testimony, and to you alone belongs the finding of the facts. You are to examine the testimony of each witness. You are the judges of the credibility of the witnesses. You are to consider the intrinsic character of the testimony, whether it is intrinsically probable or not. You will consider any circumstances which affect the credibility of the witnesses, and give the testimony of each witness such weight as you think it is entitled to receive, and render your verdict as the preponderance of the evidence appears to be in your minds. The deed to the plaintiff from the Central Pacific Railroad Company is dated February 13, 1889, only two or three months before the commencement of this suit. The deed, it is true, is a quitclaim deed, but if the title to the premises in question was in the Central Pacific Railroad Company at that time, that deed conveyed the title to Francoeur, and in that case, if the title was in the Central Pacific Railroad Company and conveyed to Francoeur, there must be a verdict for the plaintiff on that issue, and the plaintiff will be entitled to recover unless the other defense of the bar, by the statute of limitations, is found in favor of the defendant, in which case, of course, that will control.

The first great question to determine, is, was the title in the Central Pacific Railroad Company at the date of that deed? If it was, it must have passed under the act of 1862, granting lands to aid in the construction of the Central Pacific Railroad Company, and if the title vested under that act, then the United States had nothing left in it, and it could afterwards convey no title by patent to the defendant in this case. The act of 1862 granted all sections numbered with odd numbers within a space of 10 miles on each side of the road to the Central Pacific Railroad, to which other right had not attached at the date of the final definite location of the road, and mineral lands were excepted. If the land in question was mineral land within the meaning of that act, the title never passed to the Central Pacific Railroad, because it was not granted. It was excepted out of the grant. If it was not mineral land, and there is no claim that any other rights had attached, then of course the title passed to the Central Pacific Railroad Company, so it is important to inquire whether, at the time the right of the company specifically attached to this land, it was mineral land, within the meaning of this provision of the statute. If you should determine that it was mineral land, that ends the case, because the company had no title which it could convey to the plaintiff in this case, and he relies upon

no other title. The complaint alleges and shows, and all of the testimony shows, and there is none to the contrary, that these premises are in fact mineral land. They were worked for years and a large quantity of gold taken out of them. They are in fact now, and were at the commencement of this suit according to their own allegations, mineral lands. If they were in fact mineral lands at the time of the commencement of this suit, they must necessarily have been in fact mineral lands in 1862, at the date of the passage of this act, and such lands as congress designed to exclude or except from the operation of the grant, for the character of the lands in this particular has not changed; but it has been held by the courts that only those are to be regarded as mineral lands within the meaning of the act of congress, which were known to be mineral, or which there was satisfactory reason to believe were mineral at the time of the attaching of the right of the company to those particular lands. As it has been stated in the language of the courts, the words "mineral land," as used in the act of congress, mean land known to be mineral at the time the grant took effect, and attached to the specific land in question, or which there was satisfactory reason to believe were such at said time. Only such land as was known to be mineral, or which there was satisfactory reason to believe was mineral at the time the grant attached to the land, is excepted from the grant.

Gentlemen, you have the starting point that these premises were in fact mineral lands at that time. The question then arises, whether or not they were known, or there was sufficient reason to believe, at the time this grant attached—and that is when the line of the road became definitely fixed, according to my construction of the act—to be mineral land, or whether there was sufficient reason to believe they were mineral lands. Perhaps that is a little too restricted, because there may be mineral land on portions of land so apparent and obvious that any one seeing it, would know it on sight, and yet no one may have been at that point to observe it at the time; yet because no one happened to be there, if the fact of their being mineral land is so obvious that it would have been manifest to any one who inspected it, that, I take to be mineral land within the meaning of this act. But it is sufficient for this case to take the other definition. For the purpose of this case, these lands were in fact mineral. The question is, were they known to be mineral within the meaning of the act, or was there good reason to believe they were mineral.

Gentlemen, you have heard the testimony on that point. There is testimony here tending to show that persons did visit them, saw this mine, and saw men at work on this very ledge as early as 1862, and earlier. That is a long time ago. Of course you cannot expect to find very definite and precise testimony in regard to transactions that occurred so long ago, but you take that in connection with the fact that they were mineral, and take such other testimony as was presented to you. and give it such weight as you think it entitled to, for the purpose of determining whether it was known to be mineral, or there was good reason to believe at the time, that it was mineral.. All the testimony shows,

the land was good for nothing for agricultural purposes, and there was very little timber on this piece of land according to the testimony. So, if it was good for anything, it was perhaps good for mining purposes. You heard the testimony that they did not take it up, or if they did, and abandoned it, that they abandoned it, because they were unable on account of the inaccessibility of the mine, and the want of funds, to proceed and work the mine. In determining that question, this is to be taken into consideration. It does not appear that the Central Pacific Railroad Company ever made any claim to this particular piece of land. They filed a list upon a claim of other land surrounding it, and on parts of the same section, but omitted to file this, nor did they so far as the testimony shows file any independent or separate claim to it. The testimony shows also that it does not appear that the Central Pacific Railroad ever interfered with the parties who finally took it up and mined there. It does not appear that they ever made any adverse claim. It does appear that they did not contest the application for patent even as late as 1885. When a person applies for a patent for mining land, the law requires that publication should be given so as to give plenty of time to advise the world of what is going on. The evidence shows, affirmatively, that the company took no steps to oppose the issuing of this patent, under which defendant claims; and within two or three months before the commencement of this suit, the company executed this deed to the plaintiff in this case, and took particular care to protect itself in the form of that deed. The deed is that "they do remise, release, and quitclaim to the said G. H. Francoeur, and his heirs and assigns, all the right, title and interest that said company, or the said trustees now have or may hereafter acquire from the government of the United States" in and to the following described tracts of land, "reserving however all claim of the United States to the same as mineral land." The small consideration of the deed with the vast amount of improvements upon it, and the fact that they only remise and release and quitclaim their right and title, and still protect themselves from any claims against the United States by this reservation, you are entitled to consider in connection with the other testimony as indicating the probability that the company itself did not consider that that was within the provision of the grant. That is not conclusive, but is a circumstance in connection with the other facts in the case that you are entitled to consider in determining the first question submitted as to whether, in 1862, these were known mineral lands, or there was good reason to believe they were mineral lands. If they were in a known mineral belt also (and there is some testimony tending to show that they were) that would be an indication that there might be good reason to believe there was a known mine here to those who saw the ledge. All these facts you will take into consideration. You will take into consideration, also, all of the contradictory testimony that you have heard from the defendants, and, as the preponderance appears to be, find "Yes," or "No," and annex your answer to that question.

The next question which you are called upon to answer is: "Was the land in question known to be mineral, or was there good reason to be-

lieve that it was mineral, at the time that the line of the road was definitely located in 1866?" That is, four years afterwards. The remarks I made with reference to the first inquiry are also applicable to this inquiry. Then there is additional testimony here with reference to the actual taking up of this claim and prospecting it between those times. The grant takes effect on the specific land from the time of the filing of the map of the definite location, or when no such map is filed from the time of the definite location in fact of the road. The map of general location was filed in 1862, but no map of definite location was filed until the completion of the road, so far as the evidence discloses. On the contrary, the allegations in the complaint are that the road was definitely located in 1866. There is no allegation that it was located earlier, and the presumption is that they allege it at the earliest day justified by the facts, and the jury are entitled to consider that that is the time when the road was definitely located, there being no allegation or averment that it was located on an earlier day, or you might say, the day before. Until that definite location, it could not be determined where the grant would fall, and to what land it would attach. When the definite location is filed, they cannot change it afterwards. 'Between the filing of the map of definite route, and the general location, there was a right to vary the line, because instead of being 10 miles on each side of the road, there was 15 miles withdrawn within which to swing, 5 miles on each side, to vary the line of the road and still retain their rights. At this time in 1866, was the land in question known mineral land, or was there good reason to believe it to be mineral land? Take all the testimony in the case, and find on that issue as you think the preponderance of testimony is. There is considerably more testimony with reference to that than there was in regard to the prior date—1862.

Is the land in question in fact mineral land? Upon that issue there is no conflict of testimony. It is alleged in the complaint itself that a gold mine was discovered as early as 1883, and the parties took it up, and took possession of it. The testimony all shows that it was worked for years, and large quantities of gold were taken out, so that there is no conflicting testimony in regard to that question. If you find that this was known mineral land, within the meaning of the act, or land that there was good reason to suppose to be mineral land, at the time the grant attached, then it is within the exception of the grant, and you must find for the defendant. If you find that it was not known mineral land, and there was not good reason to believe it was mineral land at the date, 1862, you will find for the plaintiff on that issue. As to the second date, 1866, the same rule will apply. If you find it was known mineral land in 1866, the date when the road became definitely located, or there was good reason to believe it was mineral land, you will find for the defendant. On the contrary, if you find that it was not known mineral land at that date, or there was not then good reason to believe it was, you will find for the plaintiff on that issue. If you find for the plaintiff on those two issues, the title would be in favor of the plaintiff, and you would have to find a general verdict in favor of the plaintiff,

unless the defendant establishes the defense of the statute of limitations. The defendant has set up the statute of limitations. The law of California is, that if a person has been in the actual, notorious, adverse possession of land for a period of five years, the right of action of the real owner is barred, and the title as to him becomes effectually vested in the defendants. This suit was brought, and the complaint was filed on June 28, 1889. The statute of limitations, therefore, began to run on June 28, 1884. If from 1884, or prior thereto, this defendant, and his grantors, were in the actual, adverse possession of these premises continuously until the commencement of this suit in 1889, then the bar of the statute attached, the plaintiff cannot recover, and your verdict in that case will be for the defendant. If he was not in such continuous adverse possession, your verdict on that issue will be for the plaintiff. If your verdict on all the issues is in favor of the plaintiff, then you must find for the plaintiff, but if you find for the defendant on either one of these issues, except the third, your general verdict must be for the defendant, and you must answer these questions accordingly.

What is an adverse possession? There is testimony tending to show that as early as 1882-83, parties went on this land, took actual possession of this mine, and continued to work it continuously down to the commencement of this suit. Those who first took up the mine, took up as the evidence shows, 1,500 feet by 300 or 600, I forget which, and conveyed to their successors in interest by those metes and bounds. The grantees went into possession, and finally conveyed to the Eagle Mining Company. Then that company went into possession. There is testimony tending to show that they worked continuously on that claim, expended a large amount of money, away up towards the hundred thousands, in improvements in and about the mine, and continuously worked down to the commencement of this suit. If they did, they actually took possession of a portion of that land, and worked on it, claiming title to the full boundaries and continued in possession; that is, possession of the whole, within the meaning of the law. They are not limited to the precise portion upon which they stood and worked. No one else appears by the testimony to have interfered. There is no testimony that the Central Pacific Railroad Company all this time made any claim to it at all, and the fact that the Central Pacific Railroad Company did not make any claim, is no evidence that these parties held it under it and by agreement with it. The testimony all tends to show that these parties held, claiming by their own right, first the mining claims as taken up and conveyed to them under the laws of the United States, and afterwards under the patent issued in pursuance of those laws of the United States upon such claim. I instruct you that the title for a portion of the time unless granted to the railroad company was in the United States. If it was in the United States, or believed to be in the United States, it does not prevent the operation of the statute of limitations, if the claim was adverse to the Central Pacific Railroad Company. At least, the most that can be said is, that the matter was doubtful as to where the title was, and there was a good foundation for claiming that this was

mineral land, and excepted from the grant, so that a party could very well go in there in good faith, buy a claim, located by some one else, and under the laws of the United States continue his possession, claiming under that claim, present his claim for a patent to the United States, obtain it, and continue under it in good faith. On that question I will read you a passage from the decision in the case of *Hayes* v. *Martin*, in 45 Cal. 563, which covers that exact ground. "It is not requisite that the party who relies on the statute should show that he claims his title in hostility to the United States." These parties did not claim in hostility, but went in under the laws of the United States, and finally got a patent. "He may admit the title in the United States, either with or without a claim on his part or the right to acquire the title from the United States, and it is sufficient if he has such possession as is required by the statute, and claims in hostility to the title which the plaintiff establishes in the action." *Id.* And this doctrine was repeated in *McManus* v. *O'Sullivan*, 48 Cal. 15. These parties not only admitted the title of the United States but claimed the right to enter under their laws, and they claimed a patent under those laws and got it. They claim in hostility, as far as the evidence shows, to the title of this complainant. The testimony tends to show that their possession commenced as early as 1882 or 1883 at the latest. The testimony also tends to show that the possession was continuous under these claims to a part, with a claim to the whole, according to the boundaries of their deed, down to the commencement of this suit. If you find that to be a fact, the bar of the statute attaches, and you must find a general verdict for the defendant, and a verdict for the defendant under this last special issue submitted to you. If you find they did not, and were not in continuous possession adverse to this plaintiff during that time, and it was broken, they have failed to maintain the bar to the statute of limitation.

Gentlemen, this is all I think it necessary to say to you upon the subject. I hand to you the issues. The first one you will find for the plaintiff or defendant, as you find the case to be. If you find for the plaintiff, you must find in all the issues against the defendant, except the third. If you find on any one except the third against the plaintiff you must find a general verdict for defendant. As to the others you will answer "Yes," or "No," according as you find them to be.

The jury found for defendant, and in answer to each of the special issues answer "Yes."